INMAN, Judge.
 

 *292
 
 When a police officer initiates a traffic stop and, in the course of accomplishing the mission of the stop, develops reasonable suspicion that the driver or passenger is engaged in illegal drug activity, the officer may prolong the stop to investigate that suspicion without violating the passenger's Fourth Amendment rights.
 

 I.
 
 FACTUAL AND PROCEDURAL HISTORY
 

 Defendant, a passenger in a vehicle stopped for a traffic violation, was indicted for possession of heroin and possession of drug
 
 *293
 
 paraphernalia on 13 July 2015 after a search of the vehicle revealed the presence of the drug. Prior to trial, Defendant filed a motion to suppress all evidence obtained as a result of the traffic stop, contending that the police officer executing the stop had impermissibly and unconstitutionally extended the traffic stop without reasonable suspicion or probable cause. Following a hearing on the motion to suppress, the trial court orally denied the motion after making findings of fact and conclusions of law, and later entered a written order consistent with its oral ruling. In the course of trial, Defendant's counsel objected to the introduction of the evidence subject to the earlier motion and was overruled by the trial court. The jury found Defendant guilty on both charges, and the trial court entered its judgment on 1 September 2016. Defendant timely filed his notice of appeal on 8 September 2016.
 

 The findings in the trial court's written order are summarized as follows:
 

 On 26 November 2014, Officer Matthew Freeman ("Officer Freeman"), a patrol officer with the Charlotte-Mecklenburg Police Department ("CMPD"), was on patrol in a vehicle near Nations Ford Road in Charlotte, North Carolina. Officer Freeman had received training in the identification of drugs and had been a patrolman for almost six years, participating in 100 drug arrests. In the course of the patrol, Officer Freeman pulled into the parking lot of a Motel 6. He considered the location a high crime area. When Officer Freeman entered the parking lot, he saw two white males sitting in a green
 
 *684
 
 Honda. After Officer Freeman passed by, the Honda exited the parking lot at a high rate of speed. Officer Freeman followed the car out of the parking lot as it drove toward an intersection. At the intersection, the car turned right without yielding the right-of-way to oncoming traffic turning left through the intersection, nearly causing a collision. Officer Freeman turned on his emergency lights and siren and stopped the vehicle.
 

 Once the car stopped, Officer Freeman observed that it displayed a temporary license tag. He approached the driver's side and asked the driver for his license, registration, and proof of insurance, observing that the driver was more nervous than usual. The driver provided Officer Freeman with his insurance information, the car's title, and a South Carolina driver's license, which identified him as Matthew Matchin ("Matchin").
 
 [1]
 
 When asked why they were at the motel, Matchin stated
 
 *294
 
 that he and his passenger did not go into a room there. The passenger did not have any identifying documents, but identified himself by name to Officer Freeman. Officer Freeman then returned to his patrol car to run the above information through the onboard computer.
 

 Once in his patrol car, Officer Freeman called for a back-up unit to assist him, as there were multiple occupants in the vehicle. While he waited for another officer to arrive, Officer Freeman entered the VIN number for the stopped vehicle through a 50-state database, as he did not have a state registration with which to search. This search took longer than a search using a state vehicle registration. As a result of the search, Officer Freeman determined that the vehicle was not stolen and that neither Matchin nor Defendant had any outstanding warrants. However, Officer Freeman found multiple prior drug arrests for both Matchin and Defendant.
 

 Shortly after the above searches were completed, and twelve minutes after the stop was initiated, another CMPD officer, Damon Weston ("Officer Weston"), arrived in response to Officer Freeman's earlier call for back-up. Officer Freeman spoke with Officer Weston on his arrival, and told him about the stop as well as the information gleaned from Matchin, Defendant, and the database searches. Officer Freeman told Officer Weston that he was going to issue Matchin a warning for his unsafe movement, but asked Officer Weston to approach Defendant.
 

 The officers approached the stopped vehicle together some fourteen minutes after the stop was initiated. Officer Freeman asked Matchin to step to the rear of the vehicle so that they could see the intersection where the illegal turn occurred while Officer Freeman explained his warning. Officer Freeman then gave Matchin a warning, returned the documents, and requested a search of the vehicle. Matchin declined the request. While Officer Freeman was speaking with Matchin, Officer Weston approached Defendant and observed a syringe cap in the driver's seat. Officer Weston asked Defendant to step out of the car and Defendant complied. At this time, Officer Weston observed a second syringe cap in the passenger's seat. Now four minutes into their respective conversations, Officer Weston approached Officer Freeman and informed him of the syringe caps. Officer Freeman asked Matchin if he was diabetic, and he responded that he was not. Officer Freeman then searched the vehicle, discovering two syringes and a spoon
 
 *295
 
 with a brown "liquidy" substance. The officers then arrested Matchin and Defendant.
 

 At the suppression hearing, the trial court received the benefit of testimony from Officer Freeman and Officer Weston, as well as documentary evidence in the form of a dash-cam video of the stop from Officer Freeman's patrol car.
 
 [2]
 
 Officer Freeman testified that
 
 *685
 
 this portion of Nations Ford Road was part of his usual patrol, and that he had personally responded to a high number of drug arrests, shootings, and robberies in the area. Officer Weston also testified that the motels around Nations Ford Road were "high crime, high drug areas." Officer Freeman testified that, when he pulled into the Motel 6 parking lot and spotted the green Honda, he intended to get out of his vehicle to speak with its occupants. But, before he could park his vehicle, the two men looked up at Officer Freeman with "a kind of surprised look on their face[s], wide[-]eyed type of look" and then exited the parking lot in the car at "a high rate of speed." The dash-cam video shows Officer Freeman following the green Honda out of the parking lot and the Honda can be observed turning right at a red light without yielding to oncoming traffic turning left through the intersection, nearly causing a collision. The video's timestamp shows Officer Freeman stopped the Honda and exited his vehicle at 4:25 P.M.
 

 Officer Freeman testified that he saw the car had a temporary paper tag from Pennsylvania. He also testified that Matchin seemed "overly nervous, more than ... on a normal traffic stop, more shaking of the hands. Kind of not really directly answering [questions] .... Just kind of stumbling a bit about the answer." Officer Freeman also detailed the contents of his conversation with Matchin in his testimony, stating that Matchin claimed that he went into the Motel 6 to meet a friend in the lobby, although he could not remember the friend's name. Per the dash-cam video, Officer Freeman returned to his patrol car at 4:26 P.M., less than two minutes into the stop.
 

 Officer Freeman testified that he radioed for back-up upon returning to his vehicle, consistent with general safety and CMPD policy concerning traffic stops with multiple occupants. While he waited for another officer to arrive, Officer Freeman entered the VIN number for the stopped vehicle through a 50-state database, as he did not have a permanent state license plate number with which to search. This
 
 *296
 
 national database search alone took between five to eight minutes, longer than a search using a permanent license plate registered in a single state. Officer Freeman also ran Matchin's and Defendant's names through a local database of arrest and other records, followed by a search of a statewide database. These searches revealed multiple prior drug arrests for both Matchin and Defendant. Officer Freeman testified that his conduct up to this point in the stop, including the questioning of Matchin and Defendant, his database searches, and his request for back-up, were standard procedure in the course of a traffic stop involving multiple occupants.
 

 On the dash-cam video, chimes from Officer Freeman's onboard computer can be heard multiple times between 4:27 P.M., a minute after he returned to his patrol car, and 4:36 P.M. Officer Freeman testified that the chimes indicated the return of a result from one of his database searches. Less than a minute after the last chime played in the dash-cam excerpt, Officer Freeman can be heard talking in person with Officer Weston, and Officer Freeman testified that he was still searching for Defendant's information and receiving results from the statewide database when Officer Weston arrived on the scene.
 

 The conversation between the officers was captured on the dash-cam video played for the trial court. It begins with Officer Freeman stating that "the guy in the front passenger seat is named Samuel Campola. I've heard that name before." After providing Defendant's prior arrest history to Officer Weston, Officer Freeman then describes his arrival at the Motel 6, where "as soon as they see me [Officer Freeman], his eyes get real big and [they] just take off." Officer Freeman is next heard describing the vehicle's failure to yield to oncoming traffic, and the officers discuss how to resolve the stop. Officer Freeman provides Officer Weston with Matchin's arrest history, and then reiterates that he had "heard of Samuel Campola before" and that Defendant's physical appearance indicated he was a heroin user. He then tells Officer Weston his suspicion that "they [Matchin and Defendant] were either buying or selling over there [at the Motel 6.]" Officers Freeman
 
 *686
 
 and Weston next agree that Officer Freeman will approach the driver, ask him to exit the vehicle, and issue him a warning while Officer Weston speaks with Defendant. The officers agree on the course of action, and leave the vehicle at 4:39 P.M.
 

 The video shows the officers approach the vehicle, with Officer Freeman speaking to Matchin at the rear of the vehicle and Officer Weston talking to Defendant through the passenger window. Per his testimony, Officer Freeman asked Matchin to step out of the vehicle, which was his standard practice when explaining traffic violations to a driver. Once at
 
 *297
 
 the rear of the vehicle, Officer Freeman returned the driver's license, the vehicle's title, and proof of insurance to Matchin and began explaining his traffic warning. Officer Freeman then asked the driver if there was anything illegal in the car and for consent to search the vehicle. Matchin refused the search.
 

 While Officer Freeman was speaking to the driver at the rear of the vehicle, Officer Weston was speaking to Defendant through the passenger window. Officer Weston noticed an orange syringe cap in the driver's seat that Matchin had just vacated. Officer Weston asked Defendant if he possessed any weapons or drugs and if he consented to a search of his person. Defendant said that he had nothing illegal and gave Officer Weston permission to search him. When Defendant stepped out of the vehicle to allow Officer Weston to perform the search, Officer Weston noticed a second orange syringe cap, this time in the now-empty passenger's seat of the vehicle. Officer Weston informed Officer Freeman of his discovery, and resumed his search of Defendant. Officer Weston found nothing illegal on Defendant's person.
 

 Officer Freeman then searched the vehicle while Officer Weston stood with Matchin and Defendant outside the vehicle. Officer Freeman opened the passenger door, where he observed a syringe cap in the driver's seat and a syringe cap in the passenger's seat. Officer Freeman also saw a spoon protruding from beneath the passenger's seat. The spoon had a brown substance on it in a partially liquid, partially solid state. Officer Freeman also saw uncapped syringes, a Q-tip with the cotton pulled off, and a belt in the front of the car, as well as an open bottle of liquor in the backseat. Officer Freeman photographed the items he found in the vehicle and radioed for an officer with more experience with heroin to assist. The third officer arrived and found a baggie containing black-tar heroin in Matchin's sock.
 
 [3]
 
 Both Matchin and Defendant were arrested at the scene.
 

 II.
 
 ANALYSIS
 

 Defendant argues on appeal that the trial court erred in denying his motion to dismiss, contending that the officers unconstitutionally extended the stop and that any reasonable suspicion that arose to justify an extension of the stop was not particularized to Defendant. Because reasonable suspicion sufficient to detain both Matchin and Defendant arose at the time Officer Freeman completed his record searches in the
 
 *298
 
 course of and prior to accomplishing the mission of the traffic stop, we hold there was no error.
 

 A. Standard of Review
 

 We review an order on a motion to suppress by determining whether the trial court's findings of fact are supported by competence evidence and whether those findings support the conclusions of law.
 
 State v. Edwards
 
 ,
 
 185 N.C. App. 701
 
 , 702,
 
 649 S.E.2d 646
 
 , 648,
 
 disc. review denied
 
 ,
 
 362 N.C. 89
 
 ,
 
 656 S.E.2d 281
 
 (2007). "Our review of a trial court's conclusions of law on a motion to suppress is
 
 de novo
 
 [,]"
 
 State v. Chadwick
 
 ,
 
 149 N.C. App. 200
 
 , 202,
 
 560 S.E.2d 207
 
 , 209 (2002) (citing
 
 State v. Brooks
 
 ,
 
 337 N.C. 132
 
 , 140-41,
 
 446 S.E.2d 579
 
 , 585 (1994) ), meaning we consider the legal conclusion anew and freely substitute our judgment for that of the trial court.
 
 Tucker v. Mecklenburg Cnty. Zoning Bd. of Adjustment
 
 ,
 
 148 N.C. App. 52
 
 , 55,
 
 557 S.E.2d 631
 
 , 634 (2001),
 
 aff'd in part, discretionary review improvidently allowed in part
 
 ,
 
 356 N.C. 658
 
 ,
 
 576 S.E.2d 324
 
 (2003).
 

 The trial court did not distinguish between findings of fact or conclusions of law
 
 *687
 
 in its order; however, "[t]he labels 'findings of fact' and 'conclusions of law' employed by the trial court in a written order do not determine the nature of our review. If the trial court labels as a finding of fact what is in substance a conclusion of law, we review that 'finding'
 
 de novo
 
 ."
 
 Westmoreland v. High Point Healthcare Inc.
 
 ,
 
 218 N.C. App. 76
 
 , 79,
 
 721 S.E.2d 712
 
 , 716 (2012) (internal citations omitted).
 

 B. The Constitutional Duration of Traffic Stops
 

 The Fourth Amendment to the United States Constitution protects persons from "unreasonable searches and seizures," U.S. Const. amend. IV, and its protections extend to traffic stops.
 
 State v. Styles
 
 ,
 
 362 N.C. 412
 
 , 414,
 
 665 S.E.2d 438
 
 , 439 (2008). As established by the United States Supreme Court in
 
 Rodriguez v. United States
 
 , 575 U.S. ----,
 
 135 S.Ct. 1609
 
 ,
 
 191 L.Ed.2d 492
 
 (2015), the Amendment's "Constitution[al] shield" prohibits police from "exceeding the time needed to handle the matter for which the [traffic] stop was made[.]"
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1612
 
 ,
 
 191 L.Ed.2d at 496
 
 . Thus, "[u]nder
 
 Rodriguez
 
 , the duration of a traffic stop must be limited to the length of time that is reasonably necessary to accomplish the mission ...
 
 unless reasonable suspicion of another crime arose before the mission was completed
 
 [.]"
 
 State v. Bullock
 
 ,
 
 370 N.C. 256
 
 , 257,
 
 805 S.E.2d 671
 
 , 673 (2017) (citing
 
 Rodriguez
 
 , 575 U.S. at ----,
 
 135 S.Ct. at 1614
 
 ,
 
 191 L.Ed.2d at
 
 499 ) (emphasis added).
 

 In
 
 Bullock
 
 , the North Carolina Supreme Court set forth with clarity the parameters of a constitutional traffic stop post-
 
 Rodriguez
 
 :
 

 *299
 
 The reasonable duration of a traffic stop ... includes more than just the time needed to write a ticket. "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' " [
 
 Rodriguez
 
 ] at ----,
 
 135 S.Ct. at 1615
 
 [,
 
 191 L.Ed.2d at 499
 
 ] (alteration in original) (quoting [
 
 Illinois v.
 
 ]
 
 Caballes
 
 , 543 U.S. [405,] 408,
 
 125 S.Ct. 834
 
 [,
 
 160 L.Ed.2d 842
 
 (2005)] ). These inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."
 

 Id.
 

 In addition, "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1616
 
 [,
 
 191 L.Ed.2d. at 500
 
 ]. These precautions appear to include conducting criminal history checks, as
 
 Rodriguez
 
 favorably cited a Tenth Circuit case that allows officers to conduct those checks to protect officer safety.
 
 See
 
 id.
 

 (citing
 
 United States v. Holt
 
 ,
 
 264 F.3d 1215
 
 , 1221-22 (10th Cir. 2001) (en banc),
 
 abrogated on other grounds as recognized in
 

 United States v. Stewart
 
 ,
 
 473 F.3d 1265
 
 , 1269 (10th Cir. 2007) );
 
 see also
 

 United States v. McRae
 
 ,
 
 81 F.3d 1528
 
 , 1536 n.6 (10th Cir. 1996) ("Considering the tragedy of the many officers who are shot during routine traffic stops each year, the almost simultaneous computer check of a person's criminal record, along with his or her license and registration, is reasonable and hardly intrusive."),
 
 quoted in
 

 Holt
 
 ,
 
 264 F.3d at 1221
 
 . Safety precautions taken to facilitate investigations into crimes that are unrelated to the reasons for which a driver has been stopped, however, are not permitted if they extend the duration of the stop.
 
 Rodriguez
 
 , 575 U.S. at ----,
 
 135 S.Ct. at 1616
 
 [,
 
 191 L.Ed.2d at 500
 
 ]. But investigations into unrelated crimes during a traffic stop, even when conducted without reasonable suspicion, are permitted if those investigations do not extend the duration of the stop.
 
 See
 

 id.
 

 at ----, ----,
 
 135 S.Ct. at 1612, 1614
 
 [,
 
 191 L.Ed. 2d at 499-500
 
 ].
 

 Bullock,
 

 370 N.C. at 257-258
 
 ,
 
 805 S.E.2d at 673-74
 
 (alterations to citations added).
 

 Defendant argues that two unconstitutional extensions of the traffic stop occurred in this case: (1) when Officer Freeman waited roughly
 
 *300
 
 twelve minutes after first speaking with Matchin and Defendant before issuing his warning to Matchin; and (2) when Officer Freeman questioned Matchin while Officer Weston questioned and searched Defendant.
 

 We disagree with Defendant that Officer Freeman unconstitutionally extended the duration of the stop for several reasons. First, Officer Freeman was engaged in conduct
 
 *688
 
 within the scope of his mission until Officer Weston arrived roughly twelve minutes later. Defendant does not challenge any findings relating to Matchin's traffic violation or the trial court's finding that Officer Freeman was engaged in a series of database searches during this time, including a search of a 50-state database for the VIN number that "takes longer to process than a check of a registration card." As held by the United States Supreme Court in
 
 Rodriguez
 
 and recognized by the North Carolina Supreme Court in
 
 Bullock
 
 , database searches of driver's licenses, warrants, vehicle registrations, and proof of insurance all fall within the mission of a traffic stop.
 
 Rodriguez
 
 , 575 U.S. at ----,
 
 135 S.Ct. at 1615
 
 ,
 
 191 L.Ed. 2d at 499
 
 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' " (alteration in original) (quoting
 
 Caballes
 
 , 543 U.S. at 408,
 
 125 S.Ct. 834
 
 ,
 
 160 L.Ed.2d 842
 
 ) );
 
 Bullock
 
 ,
 
 370 N.C. at
 
 257
 
 805 S.E.2d at 673
 
 ("These inquiries include 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.' " (quoting
 
 Rodriguez
 
 , 575 U.S. at ----,
 
 135 S.Ct. at 1615
 
 ,
 
 191 L.Ed.2d at
 
 499 ) ). As for his research into Matchin and Defendant's criminal histories, this too was permitted under
 
 Rodriguez
 
 and
 
 Bullock
 
 as a safety precaution related to the traffic stop.
 
 Bullock
 
 ,
 
 370 N.C. at
 
 258
 
 805 S.E.2d at 674
 
 (" '[A]n officer may need to take certain negligibly burdensome precautions in order to complete his mission safely.' These precautions appear to include conducting criminal history checks ...." (quoting
 
 Rodriguez
 
 , 575 U.S. at ----,
 
 135 S.Ct. at 1616
 
 ,
 
 191 L.Ed.2d at
 
 500 ) ). Because these searches were within the scope of his mission, no delay could occur until they were completed, and the uncontradicted evidence demonstrates that the database searches began within a minute of him returning to his vehicle with Matchin's and Defendant's information and continued up until Officer Weston arrived.
 
 [4]
 

 *301
 
 Second, Officer Freeman's request for back-up by Officer Weston was itself a safety precaution. The trial court found that the back-up call was made "because there were two occupants in the vehicle[,]" and Officer Freeman testified that safety concerns and CMPD policy dictated that he request back-up when stopping a vehicle with multiple occupants. "[B]ecause officer safety stems from the mission of the traffic stop itself, time devoted to officer safety is time that is reasonably required to complete that mission."
 
 Bullock
 
 ,
 
 370 N.C. at
 
 261
 
 805 S.E.2d at 676
 
 . Even if we were to assume
 
 arguendo
 
 that Officer Freeman's call for back-up was a safety precaution divorced from the traffic stop, such a precaution is impermissible only "if [it] extend[s] the duration of the stop."
 

 Id.
 

 at ----,
 
 805 S.E.2d at
 
 674 (citing
 
 Rodriguez
 
 , 575 U.S. at ----,
 
 135 S.Ct. at 1615
 
 ,
 
 191 L.Ed.2d at
 
 500 ). Here, no extension of the stop occurred because database searches within the scope of the mission were running from the time Officer Freeman returned to his car and until Officer Weston arrived.
 

 In addition to holding that Officer Freeman was acting within the scope of his mission until Officer Weston arrived, we further hold that, by the time Officer Weston arrived on the scene, Officer Freeman had developed a reasonable suspicion of criminal activity sufficient to constitutionally extend the traffic stop. Reasonable suspicion arises where an officer possesses "a particularized and objective basis for suspecting the particular person stopped of criminal activity."
 
 Navarette v. California
 
 , 572 U.S. ----, ----,
 
 134 S.Ct. 1683
 
 , 1687,
 
 188 L.Ed.2d 680
 
 , 686 (2014) (citations and quotation marks omitted). This
 
 *689
 
 requires "a minimal level of objective justification, something more than an unparticularized suspicion or hunch."
 
 State v. Watkins
 
 ,
 
 337 N.C. 437
 
 , 442,
 
 446 S.E.2d 67
 
 , 70 (1994) (citation and quotation marks omitted). The reasonableness of such suspicion is measured by determining whether "a reasonable, cautious officer, guided by his experience and training, would believe that criminal activity is afoot based on specific and articulable facts, as well as the rational inferences from those facts."
 
 State v. Williams
 
 ,
 
 366 N.C. 110
 
 , 116,
 
 726 S.E.2d 161
 
 , 167 (2012) (citations and internal quotation marks omitted). In engaging in this analysis, "[a] reviewing court must consider the totality of the circumstances-the whole picture."
 
 Id.
 
 at 116,
 
 726 S.E.2d at 167
 
 (internal citations and quotation marks omitted).
 

 A considerable body of case law has established what "specific and articulable facts" give rise to "rational inferences" supporting a determination of reasonable suspicion when considered in "the totality of the circumstances" with other such facts.
 
 Id.
 
 at 116,
 
 726 S.E.2d at 167
 
 (internal citations and quotation marks omitted). These include: (1) a person's history of criminal arrests,
 
 *302
 

 State v. Watson
 
 ,
 
 119 N.C. App. 395
 
 , 398,
 
 458 S.E.2d 519
 
 , 522 (1995) (holding that a police officer had reasonable suspicion for an investigatory stop of a defendant in part because the officer knew of defendant's prior drug arrests); (2) a driver's questionable travel plans,
 
 State v. Castillo
 
 , --- N.C. App. ----,
 
 787 S.E.2d 48
 
 , 55-56,
 
 appeal dismissed, review denied
 
 ,
 
 369 N.C. 40
 
 ,
 
 792 S.E.2d 784
 
 (2016) (holding that an officer's knowledge of defendant's prior DUI arrest, along with the presence of a cover scent, the defendant's extreme nervousness, registration of the vehicle to a third party, and inconsistent travel plans supported reasonable suspicion to extend a traffic stop); (3) a person's evasive action after noticing a police officer,
 
 State v. Butler
 
 ,
 
 331 N.C. 227
 
 , 233-34,
 
 415 S.E.2d 719
 
 , 722-23 (1992) (holding that a defendant's presence at a location known for drug sales and apparent flight from officers upon making eye contact, among other facts, supported reasonable suspicion); (4) an officer's recognition of an individual as one previously involved in illegal activity,
 
 Travis
 
 at 126-29, 781 S.E.2d at 678-79 (holding reasonable suspicion existed where, among other facts, the officer recognized defendant as a former informant in drug purchases); (5) a person's unusual nervousness,
 
 Castillo
 
 at ----,
 
 787 S.E.2d at
 
 55 ; (6) registration of the vehicle to a third party,
 

 id.
 

 at ----,
 
 787 S.E.2d at
 
 55 ; and (7) presence in an area known for criminal activity.
 
 Butler
 
 at 233,
 
 415 S.E.2d at 722-23
 
 .
 

 Here, the trial court made findings of fact that: (1) Officer Freeman was a trained patrol officer of six years and had participated in 100 drug arrests; (2) Officer Freeman noticed Matchin and Defendant in a high crime area;
 
 [5]
 
 (3) after Officer Freeman drove by them, Matchin and Defendant took off at high speed and made an illegal right turn, nearly causing a collision; (4) Matchin informed Officer Freeman that he and Defendant were at the motel but did not go into a room there; (5) Matchin was unusually nervous; and (6) both Matchin and Defendant had multiple prior drug arrests. All of these findings are either unchallenged or supported by uncontradicted evidence, and Officer Freeman was apprised of each fact prior to the arrival of Officer Weston and the completion of his mission in initiating the traffic stop. Thus, by the time that Officer Freeman and Officer Weston approached Matchin and Defendant, Officer Freeman could rely on all of these facts, in their totality, in arriving at a reasonable suspicion that criminal activity beyond a
 
 *303
 
 traffic violation was afoot.
 
 Watson
 
 at 398,
 
 458 S.E.2d at
 
 522 ;
 
 Castillo
 
 at ----,
 
 787 S.E.2d at
 
 55 ;
 
 Butler
 
 at 233-34,
 
 415 S.E.2d at
 
 722-23 ;
 
 Travis
 
 at 126-29, 781 S.E.2d at 678-79 ;
 
 Bullock
 
 at 260-64,
 
 805 S.E.2d at 677-78
 
 . We hold that Officer Freeman had a reasonable suspicion to extend the stop, and that such suspicion arose before he completed the mission for the stop.
 

 Even if we were to assume
 
 arguendo
 
 that the facts found above were insufficient to
 
 *690
 
 support the extended stop, the uncontradicted evidence discloses further facts supporting reasonable suspicion that we may imply from the ruling of the trial court.
 
 Smith
 
 , 135 N.C. App. at 380, 520 S.E.2d at 312 ("After conducting a hearing on a motion to suppress, a trial court should make findings of fact that will support its conclusions as to whether the evidence is admissible. If there is no conflict in the evidence on a fact, failure to find that fact is not error. Its finding is implied from the ruling of the court." (citation and quotation marks omitted) ). These include Matchin's and Defendant's surprise at seeing Officer Freeman in the motel parking lot, the titling of the vehicle to someone other than Matchin or Defendant, Matchin's statement that he met a friend at the motel but that he did not know the friend's name, and Officer Freeman's recognition of Defendant's name and appearance as someone involved in illegal drug activity.
 
 Castillo
 
 at ----,
 
 787 S.E.2d at
 
 55-56 ;
 
 Travis
 
 at 126-29, 781 S.E.2d at 678-79. Considering all the facts, both found and implied from the trial court's ruling, we hold that the totality of the circumstances supports a conclusion that Officer Freeman had reasonable suspicion to extend the traffic stop prior to the completion of his mission.
 

 Finally, we note the similarity between the facts in this case and those confronting our Supreme Court in
 
 Bullock
 
 , its most recent decision on point. There, a police officer stopped a rental car for "speeding, following a truck too closely," and weaving over the line marking the outer bound of the interstate.
 
 Bullock,
 

 370 N.C. at 258
 
 ,
 
 805 S.E.2d at 674
 
 . The officer knew the interstate was frequently used to traffic drugs between Georgia and Virginia.
 

 Id.
 

 at 258
 
 ,
 
 805 S.E.2d at 674
 
 . In asking the driver for his license and vehicle registration, the officer observed the driver appeared nervous and was not an authorized driver on the rental agreement.
 

 Id.
 

 at 258
 
 ,
 
 805 S.E.2d at 674
 
 . The officer also noticed multiple cell phones in the car.
 

 Id.
 

 at 258
 
 ,
 
 805 S.E.2d at 674
 
 . When the officer asked the driver where he was going, the driver responded that he had intended to visit his girlfriend but that he had missed his exit; however, the officer was aware that the driver had since passed at least three additional exits where he could have turned to reach his stated destination.
 

 Id.
 

 at 258
 
 ,
 
 805 S.E.2d at 674
 
 . The driver also made contradictory
 
 *304
 
 statements about his girlfriend to the officer.
 

 Id.
 

 at 259
 
 ,
 
 805 S.E.2d at 675
 
 . The officer informed the defendant he would be receiving a warning, asked the defendant to exit the vehicle, frisked the defendant, and then asked him to sit in the patrol car while the officer ran his information through local, state, and national databases.
 

 Id.
 

 at 259
 
 ,
 
 805 S.E.2d at 675
 
 . The databases returned a criminal history contrary to prior statements made by the defendant.
 

 Id.
 

 at 259
 
 ,
 
 805 S.E.2d at 675
 
 . The officer asked if he could search the rental vehicle.
 

 Id.
 

 at 259
 
 ,
 
 805 S.E.2d at 675
 
 . The driver consented to a search of the vehicle but not the possessions therein; a trained police canine arrived a few minutes later and sniffed the possessions, signaling the presence of heroin.
 

 Id.
 

 at 259
 
 ,
 
 805 S.E.2d at 675
 
 . On these facts, the Supreme Court ruled that there existed sufficient circumstances to support a reasonable suspicion of drug activity prior to the arrival of the canine, so that no unconstitutional extension of the traffic stop occurred.
 

 Id.
 

 at 260-64
 
 ,
 
 805 S.E.2d at 676-78
 
 .
 

 Defendant argues that any reasonable suspicion supporting an extension of the stop in this case was not particularized to him, and therefore any extended seizure of him individually was unlawful. We disagree. First, the record includes several circumstances, supported by uncontroverted evidence, sufficient to support a reasonable suspicion particularized to Defendant that he was engaged in drug activity, including Defendant's presence in a high crime area known by Officer Freeman to be the site of drug transactions, Defendant's history of drug arrests, his expression of surprise at seeing Officer Freeman in the Motel 6 parking lot, and Officer Freeman's recognition of Defendant's name and appearance in the context of prior illegal drug activity.
 
 See, e.g.,
 

 State v. Stone
 
 ,
 
 179 N.C. App. 297
 
 , 303-04,
 
 634 S.E.2d 244
 
 , 248 (2006) (holding that an officer had reasonable suspicion of illegal activity particularized to a passenger in a vehicle stopped for a traffic violation where he was "moving from side to side inside the vehicle
 
 *691
 
 and [the officer] also recognized defendant as someone who had been identified to police as a drug dealer"),
 
 aff'd
 
 ,
 
 362 N.C. 50
 
 ,
 
 653 S.E.2d 414
 
 (2007). Second, "[a] law enforcement officer may stop and briefly detain a vehicle
 
 and its occupants
 
 if the officer has reasonable, articulable suspicion that criminal activity may be afoot."
 
 State v. Jackson
 
 ,
 
 199 N.C. App. 236
 
 , 241,
 
 681 S.E.2d 492
 
 , 496 (2009) (citation omitted) (emphasis added). "[A] passenger in a car that has been stopped by a law enforcement officer is still seized when the stop is extended[,]"
 
 id.
 
 at 240,
 
 681 S.E.2d at 495
 
 , and it logically follows that a lawfully extended detention of the vehicle and driver due to a reasonable suspicion of drug activity includes a lawful extended detention of a passenger in that vehicle.
 
 *305
 
 Because Officer Freeman had reasonable suspicion of drug activity to lawfully extend the traffic stop, he was permitted to ask additional questions of Matchin related to drug activity in addition to issuing his traffic warning. The trial court's unchallenged findings included the fact that Officer Weston observed an orange syringe cap in the driver's seat while Officer Freeman questioned Matchin. Officer Weston then asked Defendant to exit the vehicle, which he was lawfully permitted to do, even absent reasonable suspicion as to Defendant.
 
 State v. Pulliam
 
 ,
 
 139 N.C. App. 437
 
 , 440,
 
 533 S.E.2d 280
 
 , 283 (2000) ("[T]he United States Supreme Court has affirmed the right of police to order passengers from a vehicle in order to conduct a search of the driver's car, despite the complete absence of probable cause or reasonable suspicion concerning the passengers." (citing
 
 Maryland v. Wilson
 
 ,
 
 519 U.S. 408
 
 ,
 
 117 S.Ct. 882
 
 ,
 
 137 L.Ed.2d 41
 
 (1997) ) ). The trial court also found, and Defendant does not challenge the fact, that when Defendant exited the vehicle per this lawful instruction, Officer Weston noticed a second syringe cap in the passenger's seat. Officer Weston informed Officer Freeman about the syringe caps and, following additional questioning of Matchin as to whether he was diabetic, Officer Freeman searched the vehicle and arrested Matchin and Defendant.
 
 [6]
 
 All of this conduct occurred within the course of a lawfully extended traffic stop based on reasonable suspicion of drug activity arising prior to the completion of the stop's original mission. Defendant's argument that Officers Freeman's and Weston's interactions with Matchin and Defendant after a warning was given to Matchin about his unsafe driving unconstitutionally extended the traffic stop is overruled.
 

 Defendant challenges as unsupported or erroneous several additional findings of fact and conclusions of law. Specifically, Defendant challenges the trial court's findings that Officer Freeman was still explaining his warning when he was advised of the syringe caps, and that he had not completed his mission at that time. Because we hold on
 
 de novo
 
 review that the trial court properly concluded that "Officer Freeman had reasonable suspicion of illegal drug activity, namely the possession of drug paraphernalia, and that justified prolonging the stop to investigate that behavior," any error in the challenged findings was not prejudicial.
 
 See, e.g.,
 

 State v. Williams
 
 ,
 
 190 N.C. App. 301
 
 , 307,
 
 660 S.E.2d 189
 
 (2008) (affirming a trial court's order which included an unsupported finding that was "unnecessary to the trial court's ultimate conclusions of
 
 *306
 
 law and ruling"). The trial court properly denied Defendant's motion to suppress, and any error in making an unsupported finding unnecessary to that ruling does not demonstrate "a reasonable possibility that, had the error in question not been committed, a different result would have been reached ...." N.C. Gen. Stat. § 15A-1443 (2015). As to Defendant's argument that the trial court erred in concluding Officer Weston's removal of Defendant from the vehicle was lawful and that Officer Freeman had reasonable suspicion of illegal drug activity, we affirm those conclusions on
 
 de novo
 
 review as set forth
 
 supra
 
 .
 

 III.
 
 CONCLUSION
 

 The trial court's unchallenged findings and the uncontroverted evidence confirm that Officer Freeman lawfully stopped Matchin and Defendant for a traffic violation and that,
 
 *692
 
 before he completed the mission of the stop, Officer Freeman obtained reasonable suspicion of illegal drug activity and could lawfully extend the stop to investigate any wrongdoing. The lawful investigation yielded probative evidence of a crime, and the trial court did not err in denying Defendant's motion to suppress the evidence obtained as a result of the stop.
 

 NO ERROR.
 

 Judges BRYANT and DAVIS concur.
 

 [1]
 

 The trial transcript identifies the driver's last name as "Meacham," while various filings in the printed record use the name "Matchin." Both the State and Defendant adopt the latter in their briefs, believing the transcript's spelling to be a typographical error. Because the name of the driver is not a fact at issue on appeal, we adopt the "Matchin" spelling used in the documents in the printed record and the parties' briefs for consistency and ease of reading.
 

 [2]
 

 Defendant filed a petition for writ of mandamus to compel the State to produce a copy of the dash-cam video in a format viewable by this Court. Because we are able to view the video in the format in which it was originally provided, we deny Defendant's motion.
 

 [3]
 

 The State presented evidence that the contents of the plastic bag were confirmed by chemical analysis to be heroin. Defendant does not challenge this evidence on appeal.
 

 [4]
 

 While the trial court did not make a finding of fact as to the exact length of the searches, no such finding was required: "where there is no material conflict in the evidence as to a certain fact, the trial court is not required to make any finding at all as to that fact."
 
 State v. Travis
 
 ,
 
 245 N.C. App. 120
 
 , 129,
 
 781 S.E.2d 674
 
 , 679 (2016) (citing
 
 State v. Smith
 
 ,
 
 135 N.C. App. 377
 
 , 380,
 
 520 S.E.2d 310
 
 , 312 (1999) ). In such situations, "[a] finding may be implied by the trial court's denial of defendant's motion to suppress where the evidence is uncontradicted."
 
 Smith,
 

 135 N.C. App. at 380
 
 ,
 
 520 S.E.2d at 312
 
 (citation omitted). The uncontradicted evidence introduced at trial shows that Officer Freeman was engaged in these database searches at least until the time Officer Weston arrived.
 

 [5]
 

 This is the only relevant finding challenged by Defendant, arguing that it constitutes a mere recitation of testimony. However, such recitative findings are "insufficient
 
 only
 
 where a material conflict actually exists on that particular issue."
 
 Travis
 
 at 128,
 
 781 S.E.2d at 679
 
 (emphasis added). Because the evidence is uncontradicted as to this fact, we reject Defendant's challenge.
 

 [6]
 

 Defendant argues on appeal only that the traffic stop was unconstitutionally extended; he does not argue that the search of the vehicle was unconstitutional.