IN THE SUPREME COURT OF NORTH CAROLINA

No. 194A16

Filed 3 November 2017

STATE OF NORTH CAROLINA

v.

MICHAEL ANTONIO BULLOCK

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, ___ N.C. App. ___, 785 S.E.2d 746 (2016), reversing an order denying defendant's motion to suppress entered on 4 August 2014, and vacating defendant's guilty plea entered on 30 July 2014 and a judgment entered on 30 July 2014, all by Judge Orlando F. Hudson, Jr. in Superior Court, Durham County, and remanding the case for further proceedings. Heard in the Supreme Court on 10 April 2017.

*Joshua H. Stein, Attorney General, by Derrick C. Mertz, Special Deputy Attorney General, for the State-appellant.*

*Glenn Gerding, Appellate Defender, by Jon H. Hunt and Michele Goldman, Assistant Appellate Defenders, for defendant-appellee.*

MARTIN, Chief Justice.

Officer John McDonough pulled defendant over for several traffic violations on I-85 in Durham. During the traffic stop that followed, Officer McDonough and another police officer discovered a large amount of heroin inside of a bag in the car that defendant was driving. Before the superior court, defendant moved to suppress

all evidence derived from this search, arguing that the search had violated the Fourth Amendment. The trial court denied defendant's motion to suppress, defendant appealed, and the Court of Appeals reversed the trial court's order. *State v. Bullock*, ___ N.C. App. ___, ___, 785 S.E.2d 746, 747 (2016). The Court of Appeals concluded that the traffic stop that led to the discovery of the heroin had been unlawfully prolonged under the standard that the Supreme Court of the United States set out in *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609 (2015). *Bullock*, ___ N.C. App. at ___, ___, 785 S.E.2d at 750, 752. We hold that the stop was not unlawfully prolonged under that standard, and therefore reverse.

After the superior court denied defendant's motion to suppress, defendant pleaded guilty but specifically reserved the right to appeal the denial of his motion. Before the Court of Appeals, defendant raised three arguments: first, that Officer McDonough unlawfully prolonged the traffic stop; second, that the consent to search defendant's car that defendant gave during the stop was not voluntary; and third, that the superior court erred in accepting defendant's guilty plea. In a divided opinion, the Court of Appeals agreed with defendant's first argument, which made it unnecessary for the court to rule on his other two arguments. *See id.* at ___, 785 S.E.2d at 755. The State exercised its statutory right of appeal to this Court based on the dissenting opinion in the Court of Appeals.

The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure . . . , against unreasonable searches and seizures, shall

not be violated." U.S. Const. amend. IV. "A traffic stop is a seizure 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *State v. Styles*, 362 N.C. 412, 414, 665 S.E.2d 438, 439 (2008) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Under *Rodriguez*, the duration of a traffic stop must be limited to the length of time that is reasonably necessary to accomplish the mission of the stop, *see* 575 U.S. at ___, 135 S. Ct. at 1612 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)), unless reasonable suspicion of another crime arose before that mission was completed, *see id.* at ___, ___, 135 S. Ct. at 1614, 1615. The reasonable duration of a traffic stop, however, includes more than just the time needed to write a ticket. "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Id.* at ___, 135 S. Ct. at 1615 (alteration in original) (quoting *Caballes*, 543 U.S. at 408). These inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.*

In addition, "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* at ___, 135 S. Ct. at 1616. These precautions appear to include conducting criminal history checks, as *Rodriguez* favorably cited a Tenth Circuit case that allows officers to conduct those checks to protect officer safety. *See id.* (citing *United States v. Holt*, 264 F.3d 1215, 1221-22 (10th Cir. 2001) (en banc), *abrogated on other grounds as recognized in United States*

*v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007)); *see also United States v. McRae*, 81 F.3d 1528, 1536 n.6 (10th Cir. 1996) ("Considering the tragedy of the many officers who are shot during routine traffic stops each year, the almost simultaneous computer check of a person's criminal record, along with his or her license and registration, is reasonable and hardly intrusive."), *quoted in Holt*, 264 F.3d at 1221. Safety precautions taken to facilitate investigations into crimes that are unrelated to the reasons for which a driver has been stopped, however, are not permitted if they extend the duration of the stop. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1616. But investigations into unrelated crimes during a traffic stop, even when conducted without reasonable suspicion, are permitted if those investigations do not extend the duration of the stop. *See id.* at ___, ___, 135 S. Ct. at 1612, 1614.

The reasonable suspicion standard is "a less demanding standard than probable cause" and a "considerably less [demanding standard] than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). In order to meet this standard, an officer simply must "reasonably . . . conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). The officer "must be able to point to specific and articulable facts," and to "rational inferences from those facts," that justify the search or seizure. *Id.* at 21. "To determine whether reasonable suspicion exists, courts must look at 'the totality of the circumstances' as 'viewed from the standpoint of an objectively reasonable police officer.' " *State v. Johnson*, ___ N.C. ___, ___, 803 S.E.2d 137, 139 (2017) (citations omitted) (quoting

*United States v. Cortez*, 449 U.S. 411, 417 (1981), and *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

When reviewing a ruling on a motion to suppress, we analyze whether the trial court's "underlying findings of fact are supported by competent evidence . . . and whether those factual findings in turn support the [trial court's] ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982).

In summary, the trial court found the facts as follows. Officer McDonough is an experienced police officer, having served with the Durham Police Department since 2000 and specifically on the drug interdiction team within the special operations division of the department since 2006. On 27 November 2012, while monitoring I-85 South in Durham, Officer McDonough observed a white Chrysler speeding, following a truck too closely, and weaving briefly over the white line marking the edge of the road. Officer McDonough pulled the Chrysler over, then walked up to the passenger-side window and spoke to defendant, who was the car's driver and sole occupant. Officer McDonough asked to see defendant's driver's license and vehicle registration. Defendant's hand trembled when he handed his license to Officer McDonough. The car was a rental, but defendant was not listed as an authorized driver on the rental agreement. Officer McDonough saw that defendant had two cell phones in the rental car, and, in Officer McDonough's experience, people who transport illegal drugs have multiple phones. I-85 is a major thoroughfare for drug trafficking between Atlanta and Virginia.

Officer McDonough asked defendant where he was going. Defendant said that he was going to his girlfriend's house on Century Oaks Drive in Durham, and that he had missed his exit. Officer McDonough knew that defendant was well past his exit if defendant was going to Century Oaks Drive. Specifically, defendant had gone past at least three exits that would have taken him where he said he was going. Defendant said that he had recently moved from Washington, D.C., to Henderson, North Carolina. Officer McDonough asked defendant to step out of the Chrysler and sit in the patrol car, and told defendant that he would be receiving a warning, not a ticket. Behind the Chrysler, Officer McDonough frisked defendant. The frisk revealed a wad of cash totaling $372 in defendant's pocket. After the frisk, defendant sat in Officer McDonough's patrol car.

While running defendant's information through various law enforcement databases, Officer McDonough and defendant continued to talk. Defendant gave contradictory statements about his girlfriend, saying at one point that his girlfriend usually visited him in Henderson but later saying that the two of them had never met face-to-face. While talking with Officer McDonough in the patrol car, defendant made eye contact with the officer when answering certain questions but looked away when asked specifically about his girlfriend and about where he was travelling. The database checks, moreover, revealed that defendant had been issued a North Carolina driver's license in 2000, and that he had a criminal history in North Carolina

starting in 2001. These facts appeared to contradict defendant's earlier claim to have just moved to North Carolina.

Officer McDonough asked defendant for permission to search the Chrysler. Defendant gave permission to search it but not his possessions—namely, a bag and two hoodies—within it.[1] A few minutes later, another officer arrived, and Officer McDonough opened the trunk of the Chrysler. Officer McDonough found the bag and two hoodies, but defendant quickly objected that the bag was not his (contradicting his earlier statement) and said that he did not want it to be searched. Officer McDonough put the bag on the ground and had his police dog sniff the bag. The dog alerted to the bag, and, on opening it, the officers found a large amount of heroin.

At the suppression hearing, the trial court heard testimony from Officer McDonough and reviewed video footage of the stop captured by his patrol car's dash cam. Officer McDonough testified about his experience patrolling I-85 and his knowledge that the highway serves as a major thoroughfare for drug trafficking. Officer McDonough also testified that he observed defendant going about 70 miles per hour in a 60 mile-per-hour zone, crossing over the white shoulder line twice, and coming within a car length and a half of a truck in front of him. The dash-cam video shows Officer McDonough pulling defendant over, asking him for his driver's license, and telling him not to follow other vehicles too closely. In recounting what he

---

[1] In this opinion, we do not decide whether the permission that defendant gave constituted legal consent to search the car.

observed during the traffic stop, Officer McDonough testified that defendant had two phones: one smartphone and one flip phone. The video shows Officer McDonough asking defendant about his destination and defendant giving an answer that does not match his driving route. Officer McDonough then asks for defendant's rental agreement and receives it from defendant. Shortly after this, the officer asks defendant to exit the rental car, and defendant complies. On camera, behind the rental car, Officer McDonough says that defendant will receive only a warning, and then, after asking permission, briefly frisks defendant, finding a wad of cash. After that, Officer McDonough asks defendant to sit in the front passenger seat of the patrol car, which defendant does.

During his testimony, Officer McDonough gave details about the three databases that he generally runs a driver's information through during a traffic stop: one local, one statewide, and one national. He also explained that his conversation with defendant in the patrol car happened while he was running the database checks, which ran in the background during the conversation. He testified that these checks inherently take a few minutes to run. The video captured the conversation that Officer McDonough had with defendant while the checks were running. On the video, defendant gives self-contradictory statements about when and where he has seen his girlfriend previously.

The video then shows Officer McDonough asking defendant about a list of controlled substances that might be in the car. Defendant denies possession of all of

them. He objects to any search of his bag or his hoodies, but says that Officer McDonough can search the Chrysler if he wants to. After this conversation, Officer McDonough tells defendant that he is waiting for another officer to arrive. The video shows the time after the second officer has arrived, and shows the removal of a bag from the Chrysler's trunk. Defendant suddenly says that the bag is not his and repeats that he does not want it searched. The actual dog sniff that Officer McDonough's police dog performed, and that resulted in an alert on the bag, occurs offscreen, but Officer McDonough testified about it and about the subsequent search of the bag. Officer McDonough can also be heard on the video discussing the heroin that he and the other officer have found.

The dash-cam video, combined with Officer McDonough's suppression hearing testimony, provides more than enough evidence to support the trial court's findings of fact. We therefore turn to the second part of our review: namely, "whether those factual findings in turn support the [trial court's] ultimate conclusions of law." *Cooke*, 306 N.C. at 134, 291 S.E.2d at 619. We review conclusions of law de novo. *E.g.*, *State v. Williams*, 366 N.C. 110, 114, 726 S.E.2d 161, 165 (2012).

The initiation of the traffic stop here—which defendant does not challenge— was justified by Officer McDonough's observations of defendant's driving. "[R]easonable suspicion is the necessary standard for traffic stops, regardless of whether the traffic violation was readily observed or merely suspected," *Styles*, 362 N.C. at 415, 665 S.E.2d at 440, and Officer McDonough reasonably suspected multiple

traffic violations. Defendant was driving ten miles per hour over the speed limit; following a truck too closely, which is forbidden by N.C.G.S. § 20-152; and weaving over the white line marking the edge of the road, which is forbidden by N.C.G.S. § 20-146(d)(1). These facts allowed Officer McDonough to pull defendant over based on reasonable suspicion of those violations.

Once the traffic stop had begun, Officer McDonough could and did lawfully ask defendant to exit the rental car. "[A] police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle . . . ." *Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (per curiam)). Asking a stopped driver to step out of his or her car improves an officer's ability to observe the driver's movements and is justified by officer safety, which is a "legitimate and weighty" concern. *See Mimms*, 434 U.S. at 110. "[T]he government's officer safety interest stems from the mission of the stop itself." *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1616; *see also id.* at ___, 135 S. Ct. at 1614 (indicating that the proper duration of a traffic stop includes time spent to "attend to related safety concerns"). So any amount of time that the request to exit the rental car added to the stop was simply time spent pursuing the mission of the stop.

After defendant left the rental car, Officer McDonough lawfully frisked him for weapons without unconstitutionally prolonging the stop, for two independent reasons.

-10-

First, frisking defendant before placing him in Officer McDonough's patrol car enhanced the officer's safety. "Traffic stops are 'especially fraught with danger to police officers,' so," as we have already noted, "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* at ___, 135 S. Ct. at 1616 (citation omitted) (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). Once again, because officer safety stems from the mission of the traffic stop itself, time devoted to officer safety is time that is reasonably required to complete that mission. As a result, the frisk here did not "prolong[ ]" a stop "beyond the time reasonably required to complete th[e] mission" of the stop under *Rodriguez*. *Id.* at ___, 135 S. Ct. at 1612 (second alteration in original) (quoting *Caballes*, 543 U.S. at 407). "Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." *Id.* at ___, 135 S. Ct. at 1616.

Second, traffic stops "remain[ ] lawful only 'so long as [unrelated] inquiries do not *measurably* extend the duration of the stop.'" *Id.* at ___, 135 S. Ct. at 1615 (second set of brackets in original) (emphasis added) (quoting *Johnson*, 555 U.S. at 333). It follows that there are some inquiries that extend a stop's duration but do not extend it measurably. In *Rodriguez*, the government claimed that extending a traffic stop's duration by seven or eight minutes did not violate the Fourth Amendment. *Id.* at ___, ___, 135 S. Ct. at 1613, 1615-16. The Supreme Court disagreed. *Id.* at ___, 135 S. Ct. at 1616. But here, the frisk lasted eight or nine seconds. While we do not need

to precisely define what "measurably" means in this context, it must mean something. And if it means anything, then *Rodriguez*'s admonition must countenance a frisk that lasts just a few seconds. So this very brief frisk did not extend the traffic stop's duration in a way that would require reasonable suspicion.[2]

Asking defendant to sit in the patrol car did not unlawfully extend the stop either.[3] Officer McDonough had three database checks to run before the stop could be finished: one check for information covering the Durham area, one for statewide information, and one for out-of-state information. It takes a few minutes to run checks through these databases, and it takes no more time to run the checks when a defendant is in a patrol car than when a defendant is elsewhere. Indeed, as the trial court found here and as both the dash-cam video and Officer McDonough's testimony also established, Officer McDonough spoke with defendant while the checks were running. With these checks running in the background, Officer McDonough was free

---

[2] In addition to arguing that the frisk unconstitutionally prolonged the stop, defendant also argues in his brief to this Court that the frisk itself was unconstitutional. When an appeal of right is based solely on a dissent in the Court of Appeals, we limit our review to the issue or issues "specifically set out in the dissenting opinion as the basis for that dissent," unless a party successfully petitions this Court for discretionary review of additional issues. N.C. R. App. P. 16(b). In this case, the Court of Appeals did not decide whether defendant had consented to the frisk because it decided the case on other grounds, *see State v. Bullock*, ___ N.C. App. at ___, 785 S.E.2d at 752, and neither party petitioned this Court for discretionary review of this issue. The issue is therefore not properly before us.

[3] In his brief, defendant also appears to argue that Officer McDonough independently violated the Fourth Amendment when he had defendant sit in his patrol car, regardless of whether this extended the stop. But, like the issue of whether defendant consented to the frisk, this issue was not "the basis for th[e] dissent" in the Court of Appeals, N.C. R. App. P. 16(b)(1), and no party has petitioned us to review it. It is thus not before us.

to talk with defendant at least up until the moment that all three database checks had been completed.

The conversation that Officer McDonough had with defendant while the database checks were running enabled Officer McDonough to constitutionally extend the traffic stop's duration. The trial court's findings of fact show that, by the time these database checks were complete, this conversation, in conjunction with Officer McDonough's observations from earlier in the traffic stop, permitted Officer McDonough to prolong the stop until he could have a dog sniff performed.

Officer McDonough came into the stop with extensive experience investigating drug running, and he knew that I-85 is a major drug trafficking corridor. Shortly after pulling defendant over, Officer McDonough observed defendant's nervous demeanor and two cell phones—including a flip phone—in the Chrysler that defendant was driving, and the officer learned that the Chrysler was a rental car that had been rented in someone else's name. All of this information suggested possible drug-running, even before defendant began talking.

Defendant's conversation with Officer McDonough, and other aspects of their interaction, quickly provided more evidence of drug activity. Defendant gave an illogical account of where he was going, given that he had driven past at least three different exits that he could have taken to reach his purported destination. The $372 in cash that Officer McDonough discovered during the frisk behind the car added to Officer McDonough's suspicion of drug crime. And Officer McDonough certainly

gained reasonable suspicion of drug activity that justified a prolonged stop shortly after defendant entered the patrol car.[4] There, as he continued his conversation with Officer McDonough, defendant gave mutually contradictory statements about his girlfriend, whom he claimed to be visiting, and the database check revealed, among other things, that defendant had apparently not been truthful when he said that he had recently moved to North Carolina. On top of all of this, defendant broke eye contact when discussing his girlfriend and his travel plans, after maintaining eye contact while giving apparently honest answers to other questions. So, after Officer McDonough had spoken with defendant in his patrol car and finished the database checks, the officer legally extended the duration of the traffic stop to allow for the dog sniff.

The Supreme Court indicated in *Rodriguez* that reasonable suspicion, if found, would have justified the prolonged seizure that led to the discovery of Rodriguez's methamphetamine. *See* 575 U.S. at ___, 135 S. Ct. at 1616-17. Officer McDonough prolonged the traffic stop of defendant's rental car only after the officer had formed reasonable suspicion that defendant was a drug courier, which allowed for the dog sniff that ultimately led to the discovery of heroin in the bag that was pulled from the

---

[4] As we have already said, unless a party has successfully petitioned this Court for discretionary review of other issues, we limit our review to the issue or issues "specifically set out in the dissenting opinion as the basis for that dissent." N.C. R. App. P. 16(b). The dissent in this case agreed with the majority that reasonable suspicion was not formed before defendant had entered the patrol car, *see Bullock*, ___ N.C. App. at ___, 785 S.E.2d at 756 (McCullough, J., dissenting), and the State did not petition this Court for review of this issue. We therefore take no position on whether reasonable suspicion existed earlier in the stop.

rental car. Because this extension of the stop's duration was properly justified by reasonable suspicion, it poses no constitutional problem under *Rodriguez*.

It is worth noting just how different the procedural posture of this case is from the one that the Supreme Court confronted in *Rodriguez*. There, the Eighth Circuit had not reached the question of reasonable suspicion in its opinion. *See id.* at ___, ___, 135 S. Ct. at 1614, 1616-17. As a result, the Supreme Court essentially had to assume, for the purposes of its Fourth Amendment analysis, that no reasonable suspicion had existed at any time before the dog sniff in that case occurred. *See id.* at ___, 135 S. Ct. at 1616-17. And in *Rodriguez*, the officer had issued a written warning and therefore completed the traffic stop before the dog sniff occurred. *Id.* at ___, 135 S. Ct. at 1613. So the Supreme Court found that the stop was necessarily prolonged beyond the time needed to complete the stop's mission, *see id.* at ___, 135 S. Ct. at 1614-16, but did not determine whether reasonable suspicion to prolong the stop existed, *see id.* at ___, 135 S. Ct. at 1616-17. Instead, the Supreme Court remanded the case to the Eighth Circuit and noted that the reasonable suspicion question "remain[ed] open for Eighth Circuit consideration on remand." *Id.* at ___, 135 S. Ct. at 1616-17. Here, by contrast, the question of reasonable suspicion is squarely before us.

Officer McDonough did not extend the duration of the traffic stop in this case beyond the time needed to complete the mission of the stop until he had reasonable suspicion to do so. It is worth reiterating that we are addressing only the issue that

formed the basis of the dissenting opinion in the Court of Appeals, as we are required to do under Rule 16(b) of our Rules of Appellate Procedure.  We therefore reverse the decision of the Court of Appeals and remand this case to the Court of Appeals to consider defendant's remaining arguments on appeal.

REVERSED AND REMANDED.