BERGER, Judge.
 

 *262
 

 *225
 
 Nacarrias T. Jones ("Defendant") appeals the trial court's denial of his motion to suppress. Defendant argues his constitutional rights were violated when officers unnecessarily extended a traffic stop without reasonable suspicion. We disagree and affirm.
 

 *226
 

 Factual and Procedural Background
 

 On June 10, 2015, Defendant was a passenger in a rental car driven by Jelisa Simmons ("Simmons"). Deputies Ronie Robinson ("Deputy Robinson") and Dustin Irvin ("Deputy Irvin") with the Sampson County Sheriff's Department initiated a traffic stop of Simmons' vehicle because Defendant was not wearing a seatbelt. Deputy Irvin approached the passenger side of the vehicle and observed the passenger seat "leaned back very far" while Defendant was leaning forward with his head near his knees in "a very awkward position." Deputy Irvin also observed that Defendant's hands were around his waist and not visible to Deputy Irvin. Due to the way that Defendant was "bent forward," it appeared to Deputy Irvin that Defendant "was possibly hiding a gun." When Deputy Irvin introduced himself, Defendant glanced up at him, looked around the front area of the vehicle, but remained seated in the same awkward position. Deputy Irvin testified that, based upon his training and experience, Defendant's behavior was not typical.
 

 When Deputy Irvin advised Defendant that the traffic stop was initiated because Defendant had not been wearing his seat belt, Defendant apologized. Deputy Irvin asked for Defendant's identification, but Defendant was unable to produce any document to verify his identity. However, Defendant stated that he was "not going to lie" about his identity. Deputy Irvin testified that, based upon his training and experience, use of the phrase "I'm not going to lie to you" or other similar phrases were signs of deception. Deputy Irvin asked Defendant to exit the vehicle due to Defendant's unusual behavior and because Defendant could not provide any identification.
 

 During the suppression hearing, Deputy Irvin testified as follows:
 

 [Deputy Irvin:] I asked [Defendant] if he would step out of the vehicle.
 

 [The State:] And why did you do that?
 

 [Deputy Irvin:] Just based off of his behavior. First of all, I couldn't see his hands. He was leaned forward as if he was hiding something in his lap. And also-[Defendant] didn't have his identification. So for me to complete my action of investigating the seat belt violation, I would need to know who [Defendant] was, and for that, I would need his name, his date of birth, sometimes I would need an address, just depending on how common the name is. And to do that, I would need to run all of his information through our law enforcement database.
 

 *227
 
 [The State:] And is that database something you have in your car?
 

 [Deputy Irvin:] Yes. It is something we can pull up on our terminal inside of our patrol vehicle that's mounted inside the vehicle.
 

 [The State:] And so it's mounted inside the vehicle?
 

 [Deputy Irvin:] Yes.
 

 [The State:] And is that going to pull up a photo?
 

 [Deputy Irvin:] Yes. It will pull up any driver history, criminal history, and it will pull up photos of the individual.
 

 [The State:] And is that part of why you would want him there, to look at his face, because the photo is going to be mounted in the car; is that right?
 

 [Deputy Irvin:] Yes, that's correct.
 

 ....
 

 [The State:] ... What would you have had to do if you didn't ask him out of the vehicle to go back with you to this database?
 

 [Deputy Irvin:] Well, I would have, first of all, had to remember his name and date of birth and then where he was from, which I would have to get that information, walk
 
 *263
 
 back to my vehicle, and then if I was unable to locate his information in the database, I would have to return to the vehicle-to [Defendant's] vehicle to correct whatever information, you know, was wrong, and then return back to my patrol vehicle to again attempt to locate his information. ...
 

 [The State:] And now would that have taken you longer to walk back and forth?
 

 [Deputy Irvin:] Yes, certainly.
 

 [The State:] And would that be less safe for you?
 

 [Deputy Irvin:] Yes. That would definitely be less safe because I would have to repeatedly approach the vehicle that we had pulled over, which when I initially approached the vehicle, I can see [Defendant], I can see the driver, and I know, you know, basically what's going on in the vehicle.
 

 *228
 
 But once I leave that vehicle to go back to my patrol vehicle, when I re-approach the suspect vehicle, I have no idea what's going on inside. They could have pulled weapons, they could have tried to hide narcotics. I have no idea once I have to re-approach.
 

 When Defendant exited the vehicle, he turned and pressed the front of his body against the vehicle while he kept both hands around his waist. Deputy Irvin testified that "on numerous occasions," he had observed individuals involved in traffic stops get out of vehicles with their hands near their waistline who were later discovered to have had handguns concealed in their waistbands. Defendant denied having any weapons on him, and consented to a search of his person.
 

 Defendant placed his left hand on top of the vehicle, but kept his right hand at his waistline. Because Defendant's pants were being worn below his waist, Deputy Irvin asked if he could pull Defendant's pants up. Defendant agreed and then placed his right hand on the vehicle. As Deputy Irvin was pulling up Defendant's pants, a large wad of paper towels fell out of Defendant's pants and onto the ground. Irvin asked what had fallen out, and Defendant stated, "Man, I already know," and placed his hands behind his back. Inside the paper towels, Deputy Irvin found a plastic bag which contained more than fifty-six grams of cocaine. Inside the vehicle, deputies seized a marijuana grinder, marijuana, marijuana "roaches," two cell phones, an empty plastic baggie, and two pills. Defendant claimed that he had found the bag of cocaine at the beach, along with the money, clothes, marijuana grinder, and marijuana. Defendant also stated that Simmons did not know anything about the contraband.
 

 Defendant was arrested and charged with trafficking cocaine by possession, trafficking cocaine by transportation, possession with intent to sell and/or deliver cocaine, possession of drug paraphernalia, possession of marijuana, and possession of a Schedule IV controlled substance. He was subsequently indicted for trafficking cocaine by possession, trafficking cocaine by transportation, and possession with intent to sell and deliver cocaine.
 

 On January 26, 2017, Defendant filed a motion to suppress in Sampson County Superior Court. In the January 31, 2017 order denying Defendant's motion to suppress, the trial court found that because Defendant had not provided Deputy Irvin with any form of identification, had been exhibiting evasive and nervous behavior while in the vehicle, and based on Deputy Irvin's training and experience,
 
 *229
 
 reasonable suspicion had developed to support Deputy Irvin's extension of the traffic stop.
 

 On October 23, 2017, Defendant entered an
 
 Alford
 
 plea of guilty to trafficking cocaine by possession, trafficking cocaine by transportation, possession with intent to sell or deliver, possession of marijuana, and possession of drug paraphernalia. Defendant was sentenced to an active term of thirty-five to fifty-one months in prison and ordered to pay a $ 50,000.00 fine. Defendant preserved his right to appeal the denial of his motion to suppress at the time he entered the guilty plea, and timely entered notice of appeal.
 

 Defendant argues on appeal that the trial court erred when it denied his motion to suppress evidence that was obtained during the traffic stop. Specifically, Defendant contends Deputy Irvin and Deputy Robinson
 
 *264
 
 lacked reasonable suspicion to extend the traffic stop. We disagree.
 

 Standard of Review
 

 Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law."
 
 State v. Cooke
 
 ,
 
 306 N.C. 132
 
 , 134,
 
 291 S.E.2d 618
 
 , 619 (1982). "The trial court's conclusions of law ... are fully reviewable on appeal."
 
 State v. Hughes
 
 ,
 
 353 N.C. 200
 
 , 208,
 
 539 S.E.2d 625
 
 , 631 (2000).
 

 Analysis
 

 The Fourth Amendment protects individuals against unreasonable searches and seizures ... and the North Carolina Constitution provides similar protection .... A traffic stop is a seizure even though the purpose of the stop is limited and the resulting detention quite brief. ... [A] traffic stop is permitted if the officer has a reasonable, articulable suspicion that criminal activity is afoot.
 

 State v. Styles
 
 ,
 
 362 N.C. 412
 
 , 414,
 
 665 S.E.2d 438
 
 , 439 (2008) (citations and quotation marks omitted). "Reasonable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.' "
 
 State v. Barnard
 
 ,
 
 362 N.C. 244
 
 , 247,
 
 658 S.E.2d 643
 
 , 645 (2008) (quoting
 
 Illinois v. Wardlow
 
 ,
 
 528 U.S. 119
 
 , 123,
 
 120 S.Ct. 673
 
 ,
 
 145 L.Ed.2d 570
 
 (2000) ). "The only requirement is a minimal level of objective justification, something more than an unparticularized suspicion or hunch."
 
 State v. Otto
 
 ,
 
 366 N.C. 134
 
 , 137,
 
 726 S.E.2d 824
 
 , 827 (2012)
 

 *230
 
 (citations and quotation marks omitted). "Moreover, a court must consider the totality of the circumstances-the whole picture in determining whether a reasonable suspicion exists."
 
 Barnard
 
 , 362 N.C. at 247,
 
 658 S.E.2d at 645
 
 (
 
 purgandum
 

 [1]
 
 ). A traffic stop is a reasonable seizure under the Fourth Amendment when the police have reasonable suspicion "to believe that a traffic violation has occurred."
 
 Styles
 
 , 362 N.C. at 414-15,
 
 665 S.E.2d at 440
 
 .
 

 The tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"-to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are-or reasonably should have been-completed.
 

 Rodriguez v. United States
 
 , 575 U.S. ----,
 
 135 S.Ct. 1609
 
 , 1614,
 
 191 L.Ed.2d 492
 
 , 498 (2015) (
 
 purgandum
 
 ).
 

 Accordingly,
 

 [t]he duration of a traffic stop must be limited to the length of time that is reasonably necessary to accomplish the mission of the stop, unless reasonable suspicion of another crime arose before that mission was completed. The reasonable duration of a traffic stop, however, includes more than just the time needed to write a ticket. Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. These inquiries include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.
 

 In addition, an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. These precautions appear to include
 
 *231
 
 conducting criminal history checks .... Safety precautions taken to facilitate investigations into crimes that are unrelated to the reasons for which a driver has been stopped, however, are not permitted if
 
 *265
 
 they extend the duration of the stop. But investigations into unrelated crimes during a traffic stop, even when conducted without reasonable suspicion, are permitted if those investigations do not extend the duration of the stop.
 

 State v. Bullock
 
 ,
 
 370 N.C. 256
 
 , 258,
 
 805 S.E.2d 671
 
 , 673-74 (2017) (
 
 purgandum
 
 ),
 
 cert. denied
 
 , No. 18-924,
 
 2019 WL 234992
 
 (U.S. Feb. 25, 2019).
 

 As a "precautionary measure" to "protect the officer's safety," a police officer may "as a matter of course" order the driver and passengers of a lawfully stopped car to exit his vehicle "during a stop for a traffic violation."
 
 Maryland v. Wilson
 
 ,
 
 519 U.S. 408
 
 , 412,
 
 117 S.Ct. 882
 
 ,
 
 137 L.Ed.2d 41
 
 (1997) (citations and quotation marks omitted). Because the officer's "safety interest stems from the mission of the stop itself[,] ... any amount of time that the request to exit the rental car added to the stop was simply time spent pursuing the mission of the stop."
 
 Bullock
 
 ,
 
 370 N.C. at 262
 
 ,
 
 805 S.E.2d at 676
 
 (citation and quotation marks omitted). Moreover, because "[t]raffic stops are especially fraught with danger to police officers," an officer may also lawfully frisk the defendant for weapons without "prolong[ing] a stop beyond the time reasonably required to complete the mission of the stop."
 

 Id.
 

 (
 
 purgandum
 
 ). Because "traffic stops remain lawful only so long as unrelated inquires do not
 
 measurably
 
 extend the duration of the stop," a "frisk that lasts just a few seconds ... d[oes] not extend the traffic stop's duration in a way that would require reasonable suspicion."
 

 Id.
 

 at 262-63
 
 ,
 
 805 S.E.2d at 676-77
 
 ,
 
 370 N.C. 256
 
 (
 
 purgandum
 
 ).
 

 Here, the initiation of the traffic stop was justified by Deputy Irvin's observation that Defendant was not wearing his seatbelt as a passenger of a moving vehicle in violation of Section 20-135.2A(a).
 
 N.C. Gen. Stat. § 20-135
 
 .2A(a) (2017). Deputy Irvin's reasonable suspicion of Defendant's traffic violation permitted him to initiate the traffic stop.
 

 From the moment the traffic stop was initiated, Deputy Irvin's conduct did not "prolong [the] stop beyond the time reasonably required to complete the mission of the stop."
 
 Bullock
 
 ,
 
 370 N.C. at 262
 
 ,
 
 805 S.E.2d at 676
 
 (
 
 purgandum
 
 ). Defendant was unable to provide any identification, and Deputy Irvin attempted to more efficiently conduct the requisite database checks and "complete the mission of the stop" by requesting Defendant exit the vehicle. In addition, Deputy Irvin "could and did lawfully ask [D]efendant to exit the rental vehicle" and was permitted to
 
 *232
 
 frisk Defendant for weapons.
 

 Id.
 

 During the lawful frisk, cocaine fell to the ground from Defendant's person. Because Deputy Irvin's conduct did not extend the traffic stop's duration in any way, an additional showing that Deputy Irvin had reasonable suspicion of another crime was unnecessary. Accordingly, we affirm the trial court's denial of Defendant's motion to suppress.
 

 It is immaterial that the trial court denied Defendant's motion to suppress upon a finding that Deputy Irvin had reasonable suspicion to extend the traffic stop.
 

 A correct decision of a lower court will not be disturbed on review simply because an insufficient or superfluous reason is assigned. The question for review is whether the ruling of the trial court was correct and not whether the reason given therefor is sound or tenable. The crucial inquiry for this Court is admissibility and whether the ultimate ruling was supported by the evidence.
 

 State v. Austin
 
 ,
 
 320 N.C. 276
 
 , 290,
 
 357 S.E.2d 641
 
 , 650 (1987) (citation omitted).
 

 Conclusion
 

 The trial court properly denied Defendant's motion to suppress.
 

 AFFIRMED.
 

 Judges TYSON and INMAN concur.
 

 [1]
 

 Our shortening of the Latin phrase "
 
 Lex purgandum est.
 
 " This phrase, which roughly translates "that which is superfluous must be removed from the law," was used by Dr. Martin Luther during the Heidelberg Disputation on April 26, 1518 in which Dr. Luther elaborated on his theology of sovereign grace. Here, we use
 
 purgandum
 
 to simply mean that there has been the removal of superfluous items, such as quotation marks, ellipses, brackets, citations, and the like, for ease of reading.