IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-498

No. COA20-487

Filed 21 September 2021

Forsyth County, Nos. 16 CRS 1036, 57961, 17 CRS 54966, 51594-96

STATE OF NORTH CAROLINA

v.

WILLIAM ANTHONY FRANCE, Defendant.

Appeal by Defendant from judgments entered 8 October 2019 by Judge William A. Wood II in Forsyth County Superior Court. Heard in the Court of Appeals 25 May 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Adrian W. Dellinger, for the State.*

*Ellis & Winters LLP, by Michelle A. Liguori, for Defendant-Appellant.*

GRIFFIN, Judge.

¶ 1     Defendant William Anthony France appeals from judgments entered upon his pleas of guilty to various drug-related offenses, driving while license revoked, and attaining the status of a habitual felon. Defendant argues that the trial court erred by (1) denying his motion to suppress evidence; and (2) entering a civil judgment ordering Defendant to pay attorney's fees without providing Defendant notice and an opportunity to be heard. After careful review, we conclude that the trial court did not

err in denying Defendant's motion to suppress evidence. We vacate the civil judgment as to attorney's fees and remand for further proceedings.

## I. Factual and Procedural Background

On the night of 15 February 2017, Detective L.A. Veal and Officer LaValley of the Winston-Salem Police Department were patrolling the streets of Winston-Salem in an unmarked vehicle as part of the "street crimes unit" when they noticed a vehicle with "a white light emitting from the taillight[.]" Detective Veal turned on her vehicle's emergency lights and initiated a traffic stop because of the broken taillight.

After stopping the vehicle, Detective Veal and Officer LaValley approached the vehicle. Defendant was in the driver's seat of the vehicle. His brother, Harvey France, was in the passenger's seat. Defendant's cousin, Antoine Bishop, was in the back seat. Officer LaValley then informed Defendant and the passengers of the purpose of the traffic stop and requested identification from the occupants, while Detective Veal called in the vehicle's license plate number and peered into the front and back seats of the vehicle with a flashlight. Defendant informed Officer LaValley that he did not have his driver's license. After Officer LaValley collected Harvey's identification, Harvey stated, "I can walk home. . . . I'm just saying I can walk." Officer LaValley then returned to the patrol car with the occupants' identification to conduct warrant checks. Detective Veal briefly discussed the white taillight with Defendant before joining Officer LaValley in the patrol car.

¶ 4        Detective Veal returned to the patrol car and requested that a canine unit respond to her location. Immediately thereafter, Officers Ferguson and Wagoner arrived at the scene. Detective Veal briefly greeted the officers before returning to the patrol car with Officer LaValley. Officers Ferguson and Wagoner then stood by the stopped vehicle to watch over the occupants.

¶ 5        Shortly after Detective Veal returned to the patrol car, Officer LaValley discovered that the backseat passenger, Mr. Bishop, had active warrants for his arrest. Officer LaValley exited the patrol car and, with assistance from Officer Wagoner, asked Mr. Bishop to step out of the vehicle. Mr. Bishop complied and informed Officer LaValley that he was carrying a gun. Officer LaValley then removed the gun from Mr. Bishop's possession and placed it on the trunk of the vehicle while Officer Ferguson watched Mr. Bishop from the opposite side of the car with his weapon drawn.

¶ 6        Meanwhile, Detective Veal approached the driver's side of the vehicle and asked Defendant and Harvey to place their hands on the dashboard while Officers LaValley, Wagoner, and Ferguson dealt with Mr. Bishop. After Officer LaValley placed Mr. Bishop's gun on the trunk, Officer Ferguson informed Detective Veal that he was going to step away to "render [Mr. Bishop's weapon] safe." While Officer Ferguson was securing Mr. Bishop's weapon and Officers LaValley and Wagoner were placing Defendant under arrest, Detective Veal stood watch over Defendant and

Harvey.

¶ 7        Officer Ferguson unloaded Mr. Bishop's weapon and stored it in the trunk of the patrol car. He then returned to the vehicle and told Detective Veal that he would watch Defendant and Harvey so that Detective Veal could go and "do what [she needed] to do." Detective Veal immediately returned to her patrol car, pulled out her laptop, and continued to conduct warrant checks on Defendant and/or Harvey. After conducting the warrant checks, Detective Veal began "the process of issuing a citation" to Defendant for the broken taillight and "driving with a license revoked[.]"

¶ 8        While Detective Veal was drafting the citation, the canine unit that she requested earlier responded to the scene, at which point the other officers requested that Defendant and Harvey step out of the vehicle. Defendant and Harvey complied with the officers' requests. While the other officers dealt with Defendant and Harvey, Detective Veal walked over to greet the officer with the canine and informed the officer that she had previously encountered the vehicle that evening and witnessed "a hand-to-hand transaction." The officer with the canine then walked the canine around the vehicle, and the canine "indicated a positive alert." The officers then searched the vehicle and found "multiple burnt marijuana cigarettes were located in a portable ashtray in the center console" along with "an open container of beer[.]" Officer Ferguson also searched Defendant's person and "located a digital scale in [Defendant's] pants pocket."

¶ 9        Detective Veal arrested Defendant for possession of drug paraphernalia. Detective Veal and Officer Ferguson both reported smelling "unburnt marijuana" emanating from Defendant's person. Officers Ferguson and Wagoner later conducted a strip search of Defendant at the police station and "located an individually wrapped bag of unburnt marijuana and an individually wrapped bag of a white rock-like substance," which later "tested positive for cocaine."

¶ 10       A Forsyth County grand jury issued true bills of indictment charging Defendant with several drug-related offenses, driving while license revoked, and attaining the status of a habitual felon. Defendant then filed a motion to suppress evidence obtained during the traffic stop. A hearing was held on Defendant's motion to suppress, during which Defendant argued, *inter alia*, that the length of the traffic stop was "outside the reasonable amount of time . . . allowed for a traffic stop" under the Fourth Amendment of the U.S. Constitution as interpreted in *United States v. Rodriguez*, 575 U.S. 348 (2015).

¶ 11       The trial court entered a written order denying Defendant's motion to suppress and concluded the following as a matter of law:

> The officers in this case diligently pursued their investigation into the original [traffic] violation for which [] Defendant's vehicle was stopped and the related safety concerns. The seizure of [] Defendant in this case was reasonable in every way and in compliance with the law in *Rodriguez* and other cases. . . . To the extent, if any, that the seizure of [] Defendant went beyond the scope of the

> investigation that resulted from the original traffic violation, that seizure was supported by reasonable suspicion or safety concerns independent of the traffic violation, i.e., dealing with the safety concerns which arose when Officer LaValley, not lead traffic violation investigator Det. Veal, took the back seat passenger of the [vehicle] into custody for outstanding warrants and dealing with safety concerns that arose when a loaded handgun was located by Officer LaValley on that individual. Both of these situations required Det. Veal to deviate, if only briefly, from her mission of conducting the traffic stop as it related to [] Defendant's traffic and license violations.

The trial court further concluded that the body camera footage "introduced and published during th[e] hearing corroborate[d] the fact that Det. Veal diligently pursued her investigation into the original traffic violation for which the vehicle was stopped and subsequent discovery of [] Defendant's revoked license."

¶ 12    Pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), Defendant pled guilty to possession of a controlled substance on jail premises, possession with intent to sell or deliver cocaine, two counts of possession of cocaine, possession of drug paraphernalia, possession of less than one-half ounce of marijuana, and attaining the status of a habitual felon. The trial court entered two judgments upon Defendant's convictions and sentenced him to 26 to 44 months' imprisonment for possession of cocaine and possession of drug paraphernalia and 67 to 93 months' imprisonment for the other offenses. The court also entered a civil judgment ordering Defendant to pay attorney's fees.

¶ 13        Defendant expressly reserved his right to appeal the trial court's order denying his motion to suppress and provided oral notice of appeal in open court. Defendant did not provide notice of appeal from the civil judgment ordering him to pay attorney's fees but has filed a petition for writ of certiorari seeking discretionary review of the judgment.

## II. Appellate Jurisdiction

¶ 14        We must first address our jurisdiction to hear Defendant's appeal on the issue of attorney's fees. Defendant concedes that he did not timely file notice of appeal from the civil judgment ordering him to pay attorney's fees. In acknowledgment of this error, Defendant filed a petition for certiorari with this Court seeking discretionary review of his appeal.

¶ 15        N.C. R. App. P. 21(a) provides that this Court may issue a writ of certiorari "to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost by failure to take timely action. . . ." N.C. R. App. P. 21(a)(1). "Certiorari is a discretionary writ, to be issued only for good and sufficient cause shown." *State v. Grundler*, 251 N.C. 177, 189, 111 S.E.2d 1, 9 (1959) (citation omitted). This Court has previously allowed petitions for writ of certiorari in cases where the trial court entered a civil judgment ordering the defendant to pay attorney's fees without providing the defendant notice and an opportunity to be heard. *See, e.g., State v. Friend*, 257 N.C. App. 516, 519, 809 S.E.2d 902, 905 (2018);

*State v. Baker*, 260 N.C. App. 237, 240–41, 817 S.E.2d 907, 909–10 (2018). We therefore grant Defendant's petition seeking our discretionary review on the issue of attorney's fees.

### III. Analysis

¶ 16 Defendant argues that the trial court erred by (1) denying his motion to suppress evidence; and (2) entering a civil judgment ordering Defendant to pay attorney's fees without providing Defendant notice and an opportunity to be heard. We affirm the trial court's order denying Defendant's motion to suppress evidence. We vacate the civil judgment as to attorney's fees and remand for further proceedings.

### A. Motion to Suppress

¶ 17 Defendant argues that the trial court erred in denying Defendant's motion to suppress, because the officers prolonged the duration of the traffic stop to conduct a search for drugs in violation of Defendant's rights under the Fourth Amendment of the United States Constitution as interpreted in *United States v. Rodriguez*, 575 U.S. 348 (2015). Specifically, Defendant contends that the trial court "erroneously concluded that Detective Veal diligently conducted the traffic stop, that reasonable suspicion existed to prolong the stop, and that Mr. Bishop's outstanding warrants and firearm provided a reasonable basis for delay." We disagree.

¶ 18 Our review of a trial court order denying a motion to suppress evidence "is strictly limited to determining whether the trial judge's underlying findings of fact

are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982) (citations omitted). "The trial court's conclusions of law . . . are fully reviewable on appeal." *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

¶ 19        The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "A traffic stop is a seizure" within the meaning of the Fourth Amendment "even though the purpose of the stop is limited and the resulting detention quite brief." *State v. Styles*, 362 N.C. 412, 414, 665 S.E.2d 438, 439 (2008) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).

¶ 20        While "[a] seizure for a traffic violation justifies a police investigation of that violation," *Rodriguez*, 575 U.S. at 354, "the duration of a traffic stop must be limited to the length of time that is reasonably necessary to accomplish the mission of the stop, unless reasonable suspicion of another crime arose before that mission was completed," *State v. Bullock*, 370 N.C. 256, 257, 805 S.E.2d 671, 673 (2017) (citing *Rodriguez*, 575 U.S. at 349, 353–55). "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop." *Rodriguez*, 575 U.S. at 355 (alteration in original) (citation and internal quotation marks omitted).    Such inquiries may "involve checking the driver's license,

determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citation omitted).

In addition, "[t]he Fourth Amendment permits an officer to conduct an investigation *unrelated* to the reasons for the traffic stop as long as it '[does] not lengthen the roadside detention.'" *United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018) (quoting *Rodriguez*, 575 U.S. at 354) (alteration in original); *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." (citation omitted)). "For example, an officer may question the occupants of a car on unrelated topics without impermissibly expanding the scope of a traffic stop" or "engage a K-9 unit to conduct a 'dog sniff' around a vehicle during a lawful traffic stop in an attempt to identify potential narcotics." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (citing *Johnson*, 555 U.S. at 333; *United States v. Caballes*, 543 U.S. 405, 407–09 (2005)).

"Traffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 575 U.S. at 356 (citation and internal quotation marks omitted). "[B]ecause officer safety stems from the mission of the traffic stop itself,

time devoted to officer safety is time that is reasonably required to complete that mission." *Bullock*, 370 N.C. at 262, 805 S.E.2d at 676. As a safety precaution, "a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle," along with any passengers. *Maryland v. Wilson*, 519 U.S. 408, 410, 414–15 (1997) (stating that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car"). "Safety precautions taken to facilitate investigations into crimes that are unrelated to the reasons for which a driver has been stopped, however, are not permitted if they extend the duration of the stop." *Bullock*, 370 N.C. at 258, 805 S.E.2d at 674 (citation omitted). "But investigations into unrelated crimes during a traffic stop, even when conducted without reasonable suspicion, are permitted if those investigations do not extend the duration of the stop." *Id.* (citation omitted).

¶ 23        In the instant case, Detective Veal initiated a traffic stop of Defendant's vehicle because of the vehicle's broken taillight—a "traffic violation justif[ying] a police investigation of that violation." *Rodriguez*, 575 U.S. at 354. At that point, Detective Veal was legally authorized to detain Defendant for "the length of time . . . reasonably necessary to accomplish the mission of the stop," which was to address the broken taillight. *Bullock*, 370 N.C. at 257, 805 S.E.2d at 673 (citation omitted). Upon approaching the vehicle, Officer LaValley requested identification from the occupants and informed them of the reason for the stop, while Detective Veal shined her

flashlight into the vehicle and called in the vehicle's license plate number. Officer LaValley then returned to the patrol car with the occupants' identification to conduct warrant checks. After briefly engaging with Defendant regarding his taillight, Detective Veal joined Officer LaValley in the patrol car. Such inquiries being "ordinary inquiries incident to [a traffic] stop," *Rodriguez*, 575 U.S. at 355 (alteration in original) (citation omitted), the officers' actions were well-within the scope of the mission of the stop.

¶ 24        After joining Officer LaValley in the patrol car, Detective Veal requested that a canine unit respond to her location, while Officer LaValley conducted warrant checks on the occupants. Although unrelated to the traffic mission of the stop, Detective Veal's request to "engage a K-9 unit to conduct a 'dog sniff' around [the] vehicle[,]" *Hill*, 852 F.3d at 382 (citation omitted), did "not measurably extend the duration of the stop" and "convert the encounter into something other than a lawful seizure," *Johnson*, 555 U.S. at 333; *see also Bullock*, 370 N.C. at 258, 805 S.E.2d at 674 ("[I]nvestigations into unrelated crimes during a traffic stop, even when conducted without reasonable suspicion, are permitted if those investigations do not extend the duration of the stop." (citation omitted)).

¶ 25        Immediately after Officer Veal requested the canine unit, Officers Ferguson and Wagoner arrived at the scene. Detective Veal briefly greeted the officers before rejoining Officer LaValley in the patrol car. Officer LaValley then discovered that

Mr. Bishop had active warrants for his arrest and proceeded to place Mr. Bishop under arrest with assistance from Officer Wagoner. Mr. Bishop complied and informed Officer LaValley that he had a gun on his person. At this point, the situation required the officers to take certain safety "precautions in order to complete [the] mission safely." *Rodriguez*, 575 U.S. at 356 (citation omitted).

¶ 26    After Mr. Bishop informed Officer LaValley that he had a gun, Officer LaValley removed the weapon from Mr. Bishop's possession and placed it on the trunk of the vehicle. Meanwhile, Officer Wagoner stood watch on the passenger's side of the car while Officer Ferguson watched Mr. Bishop from the opposite side of the car with his weapon drawn. While the three other officers were occupied with disarming and arresting Mr. Bishop, Detective Veal ordered Defendant and Harvey to place their hands on the dashboard and stood watch over them. After Officer LaValley placed Mr. Bishop's weapon on the trunk, Officer Ferguson informed Detective Veal that he was going to step away to "render [Mr. Bishop's weapon] safe." Officer Ferguson then unloaded Mr. Bishop's weapon and stored it in the trunk of the patrol car.

¶ 27    "[B]ecause officer safety stems from the mission of the traffic stop itself, time devoted to officer safety is time that is reasonably required to complete that mission." *Bullock*, 370 N.C. at 262, 805 S.E.2d at 676. The officers moved diligently and responsibly upon discovery of the loaded pistol. The presence of multiple officers only increased the safety and efficiency of the traffic stop. *See Wilson*, 519 U.S. at 414–15

(stating that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car"). Accordingly, all of the officers were taking legitimate and permissible steps necessary to ensure their safety. *See Rodriguez*, 575 U.S. at 356.

¶ 28        After securing Mr. Bishop's weapon, Officer Ferguson returned to the vehicle and told Detective Veal that he would watch Defendant and Harvey so that Detective Veal could go and "do what [she needed] to do." Detective Veal immediately returned to her patrol car to conduct warrant checks on Defendant and/or Harvey and began "the process of issuing a citation" to Defendant for the broken taillight and "driving with a license revoked[.]"

¶ 29        While Detective Veal was drafting citations, the canine unit that she requested earlier responded to the scene. The other officers then requested that Defendant and Harvey step out of the vehicle. While the other officers dealt with Defendant and Harvey, Detective Veal walked over to greet the officer with the canine. The officer with the canine then walked the canine around the vehicle, and the canine "indicated a positive alert."

¶ 30        At no point during the preceding course of events did the officers' actions "convert the encounter into something other than a lawful seizure." *Johnson*, 555 U.S. at 333. The facts in the Record indicate that at each point during the traffic stop Detective Veal was either "diligently pursu[ing] [the] investigation[,]" conducting

"ordinary inquiries incident to [the traffic] stop[,]" or taking necessary "precautions in order to complete h[er] mission safely." *Rodriguez*, 575 U.S. at 354–56 (citations omitted). Although the request for a canine sniff was "unrelated to the reasons for the traffic stop[,]" *Bowman*, 884 F.3d at 210 (citing *Rodriguez*, 575 U.S. at 354) (alteration omitted), the request did "not measurably extend the duration of the stop" and was therefore permissible, *Johnson*, 555 U.S. at 333.

¶ 31        Assuming *arguendo* that any of the officers' actions did unreasonably extend the duration of the stop, we agree with the trial court that the actions were justified by reasonable suspicion of criminal activity. The trial court's findings of fact state that "[t]he traffic stop was recorded on Body Worn Camera . . . and the footage was admitted as State's Exhibit 1." A review of that footage shows that when Detective Veal walked over to greet the officer with the canine, she informed the officer that she had previously encountered Defendant's vehicle that evening and witnessed "a hand-to-hand transaction." The traffic stop also occurred late in the evening and in a high crime area. Mr. Bishop had multiple active warrants for his arrest and a loaded gun on his person. Moreover, after Officer LaValley collected Harvey's identification, Harvey stated, "I can walk home. . . . I'm just saying I can walk." Although each of these factors standing alone might not provide officers with reasonable suspicion, the totality of the circumstances indicate that reasonable suspicion justified prolonging the stop. *See State v. Otto*, 366 N.C. 134, 137, 726

S.E.2d 824, 827 (2012) ("The only requirement [for reasonable suspicion] is a minimal level of objective justification, something more than an unparticularized suspicion or hunch." (citations and internal marks omitted)).

¶ 32 Lastly, Defendant takes issue with several findings of fact made by the trial court. Defendant contends that the trial court mistakenly determined that (1) "after Detective Veal approached the stopped car, she asked [Defendant] for his license;" (2) Detective Veal requested the canine unit after running warrant checks on the occupants; (3) "it takes approximately five minutes to conduct a single warrant check;" (4) "Detective Veal stood outside the driver's side window with [Defendant] as a safety precaution and she intended to return to her patrol vehicle to write [Defendant] citations once another officer relieved her and could assume security watch over [Defendant] and his brother;" and (5) [Defendant] freely volunteered his consent for the officers to search the car" and conduct a "canine sniff."

¶ 33 Even assuming that contentions (1)-(3) have merit, none of the facts Defendant challenges alter the legal analysis in this case. It is irrelevant whether Detective Veal asked for Defendant's license or not, whether Detective Veal requested the canine unit before or after conducting the warrant checks, or whether it takes five minutes or less, on average, to conduct a warrant check.

¶ 34 We also disagree that the trial court erroneously determined that Detective Veal watched over Defendant and Harvey until another officer could relieve her. The

body camera evidence clearly shows that while the other three officers were arresting Mr. Bishop and securing his weapon, Detective Veal was the only officer available to watch over Defendant and Harvey. Officer safety thus required Detective Veal to watch over Defendant and Harvey while the other officers dealt with Mr. Bishop. "[B]ecause officer safety stems from the mission of the traffic stop itself, time devoted to officer safety is time that is reasonably required to complete that mission." *Bullock*, 370 N.C. at 262, 805 S.E.2d at 676.

¶ 35        Lastly, it is irrelevant whether Defendant consented to a search or canine sniff of his vehicle. At the time the canine officer arrived and conducted the canine sniff, Detective Veal was still in the process of issuing a citation to Defendant. Although the officers requested that Defendant and Harvey step out of the vehicle before the canine sniff, "a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle," along with any passengers. *Wilson*, 519 U.S. at 410. When the canine officer conducted the drug sniff around Defendant's vehicle, the canine "indicated a positive alert." At that point, the officers were authorized to conduct a search of Defendant's vehicle for narcotics, regardless of whether Defendant consented to the search or not.

¶ 36        We therefore affirm the trial court's denial of Defendant's motion to suppress.

**B. Attorney's Fees**

¶ 37        Defendant argues that the trial court erred by entering a civil judgment

ordering Defendant to pay attorney's fees without providing Defendant notice and an opportunity to be heard. We agree, vacate the civil judgment as to attorney's fees, and remand for further proceedings.

¶ 38     N.C. Gen. Stat. § 7A-455(b) provides that a court may enter a civil judgment against a convicted indigent defendant "for the money value of services rendered by assigned counsel, . . . plus any sums allowed for other necessary expenses of representing the indigent person[.]" N.C. Gen. Stat. § 7A-455(b) (2019). However, "[b]efore imposing a judgment for . . . attorney's fees, the trial court must afford the defendant notice and an opportunity to be heard." *Friend*, 257 N.C. App. at 522, 809 S.E.2d at 906 (citations omitted). To that end, "before entering money judgments against indigent defendants for fees . . . under N.C. Gen. Stat. § 7A-455, trial courts should ask [the] defendants—personally, not through counsel—whether they wish to be heard on the issue." *Id.* at 523, 809 S.E.2d at 907. "Absent a colloquy directly with the defendant on this issue, the requirements of notice and opportunity to be heard will be satisfied only if there is other evidence in the record demonstrating that the defendant received notice, was aware of the opportunity to be heard on the issue, and chose not to be heard." *Id.*

¶ 39     After the plea hearing concluded, the following colloquy took place between the trial court and Defendant's counsel:

THE COURT: All right. Thank you, [defense counsel].

How much time?

[COUNSEL]: Your Honor, at this—at the conclusion of this hearing, I'll have approximately 40 hours. I would say 40 hours. . . .

THE COURT: That's the D rate? That's –

[COUNSEL]: Seventy-five times 40, is [$]3000.

THE COURT: Yes, sir. All right. [Defendant], sir if you'll stand up.

The trial court then proceeded to sentence Defendant and, with respect to attorney's fees, stated, "All of the costs associated with this court action will be [included in] a civil judgment. That would include the court costs, attorney's fee of $3000 and a lab fee of $1800."

¶ 40    At no point did the trial court ask Defendant "personally, not through counsel[,] whether [he] wish[ed] to be heard on the issue" of attorney's fees. *Id.* Moreover, there is no "evidence in the record demonstrating that . . . [D]efendant received notice, was aware of the opportunity to be heard on the issue, and chose not to be heard." *Id.* We therefore vacate the civil judgment ordering Defendant to pay attorney's fees and remand for further proceedings.

## IV. Conclusion

¶ 41    We affirm the trial court's denial of Defendant's motion to suppress. We vacate the civil judgment as to attorney's fees and remand for further proceedings.

AFFIRMED IN PART; VACATED IN PART AND REMANDED.

Judges MURPHY and HAMPSON concur.